JONES, DAY, REAVIS & POGUE
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Corinne Ball, Esq. (CB 8203)
Erica M. Ryland, Esq. (ER 2057)

Attorneys for Debtors
  and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
```
*In re*                                      :
                                             :
**WILLIAMS COMMUNICATIONS GROUP,**           :        **Chapter 11 Case No.**
**INC. and CG AUSTRIA, INC.,**               :        **02-11957 (SMB)**
                                             :        **(Jointly Administered)**
                              **Debtors.**   :
```
-------------------------------------------------------------x
```

**NOTICE OF PRESENTMENT OF ORDER**
**AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY**
**THE BLACKSTONE GROUP L.P. AS FINANCIAL ADVISOR**

PLEASE TAKE NOTICE that upon the annexed application of the above-captioned debtors and debtors in possession, the undersigned will present the attached proposed order to the Honorable Stuart M. Bernstein, Chief Judge of the United States Bankruptcy Court for the Southern District of New York, for signature on July 18, 2002 at 10:00 a.m.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the proposed order must be made in writing and received in the Bankruptcy Judge's chambers and by the undersigned not later than 12:00 noon on July 15, 2002. Unless objections are received by that time, the order may be signed.

Dated: New York, New York
       June 17, 2002

                                      /s/ Erica M. Ryland
                                      Corinne Ball, Esq. (CB 8203)
                                      Erica M. Ryland, Esq. (ER 2057)
                                      JONES, DAY, REAVIS & POGUE
                                      222 East 41st Street
                                      New York, NY 10017
                                      Telephone: (212) 326-3939

                                      Attorneys for Debtors
                                        and Debtors in Possession

JONES, DAY, REAVIS & POGUE
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Corinne Ball, Esq. (CB 8203)
Erica M. Ryland, Esq. (ER 2057)

Attorneys for Debtors
  and Debtors in Possession


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
*In re*                                                          :
                                                                 :
**WILLIAMS COMMUNICATIONS GROUP,**    :          **Chapter 11 Case No.**
**INC. and CG AUSTRIA, INC.,**             :          **02-11957 (SMB)**
                                                                 :          **(Jointly Administered)**
                                                                 :
                                   **Debtors.**           :
                                                                 :
-------------------------------------------------------------x

### APPLICATION OF THE DEBTORS PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2014 FOR AN ORDER AUTHORIZING THEM TO RETAIN AND EMPLOY THE BLACKSTONE GROUP L.P. AS FINANCIAL ADVISOR

TO THE HONORABLE STUART M. BERNSTEIN
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Williams Communications Group, Inc. ("WCG" and, collectively with its direct and indirect subsidiaries, the "Company") and its affiliated debtor CG Austria, Inc. ("CGA" and together with WCG, the "Debtors") hereby move this Court for entry of an order, pursuant to sections 327 and 328(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to retain and employ The Blackstone Group L.P. ("Blackstone") as financial advisor in these chapter 11 cases effective as of the commencement of these chapter 11 cases. In support of this motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over this motion pursuant to sections 157 and 1334 of title 28 of the United States Code (the "Judicial Code").  This is a core proceeding pursuant to section 157(b)(2) of the Judicial Code.  Venue for proceedings on this motion is proper in this district pursuant to section 1409 of the Judicial Code.

## Background

2.      On April 22, 2002 (the "Petition Date"), each of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On May 1, 2002, the Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed in these chapter 11 cases by the Office of the United States Trustee.

3.      WCG is a non-operating holding company whose principal asset is its ownership of Williams Communications, LLC ("WCL").[1]  No chapter 11 case has been commenced for WCL, and it continues to operate outside of bankruptcy in the ordinary course of business.

4.      The Company has built an advanced, fully operational next-generation fiber-optic broadband network in the United States spanning more than 30,000 route miles and connecting 125 U.S. cities.  With a unique infrastructure and state-of-the-art technology, the Company services the bandwidth intensive needs of high capacity communications providers.  Extending its multi-service backbone network to Asia, Europe, and the Pacific Rim, the Company offers a comprehensive global service platform for data, Internet, satellite, voice, and cellular communications.

---

[1]      CG Austria is an indirect subsidiary of WCG, and is a non-operating holding company for Williams Participations Holdings, GmBH.

NY-1220934v4

5.     The Company divides its operations into two segments: Network and Emerging Markets.  Network services include long distance voice, private line (offering bandwidth capacity), finished data (transporting data between geographically diverse systems), and video.  Network customers are carriers of voice, data, and multimedia, including large telecommunications companies, local exchange carriers, Internet service providers, application service providers, and utility companies.  Emerging Markets provides video transmission, advertising, and digital media management services.  Customers include major broadcast and cable television networks, news services, professional sports organizations, production studios, national advertisers, and advertising agencies.

6.     For the fiscal year ending December 31, 2001, WCG reported consolidated revenues of $1.19 billion and a consolidated net loss of $3.81 billion, inclusive of asset impairment and restructuring charges of $2.98 billion.  At December 31, 2001, WCG's consolidated assets were $5.99 billion, and its consolidated liabilities were $7.15 billion.  The Network segment of the Company's business accounted for approximately 86% of total revenues (net of intercompany revenue) in 2001 with the Emerging Markets segment representing the balance.  As of the Petition Date, the Company had approximately 3,200 employees worldwide.

7.     Until 1999, WCG was a wholly-owned subsidiary of The Williams Companies, Inc. ("TWC"), an energy services company.  In October, 1999, TWC completed an initial public offering and certain related private placements of WCG's common stock, which left TWC with approximately 98% of the voting power of WCG.  On April 23, 2001, TWC distributed approximately 95% of the common stock held by TWC to TWC's shareholders in a tax-free spin-off, making WCG a fully independent company.

8.     Prior to the commencement of these chapter 11 cases, the Company reached agreements (the "Restructuring Agreements") regarding the terms and conditions on which a

3

chapter 11 plan providing for the financial restructuring and de-leveraging of WCG's balance sheet would be supported by TWC, the Company's prepetition secured lenders, and holders of approximately $875 million of WCG's senior notes. On May 20, 2002, the Debtors filed a joint chapter 11 plan (the "Plan") and related disclosure statement (the "Disclosure Statement") reflecting the provisions of the Restructuring Agreements. The Debtors anticipate filing a motion for approval of the Disclosure Statement in the near future.

## Relief Requested

9.        By this Application, the Debtors respectfully request the entry of an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code authorizing them to employ and retain Blackstone as their financial advisor for the purpose of providing financial advisory and other related services in connection with the Debtors' chapter 11 cases in accordance with the terms of the letter agreement and indemnification agreement dated June 3, 2002 (collectively, the "Letter Agreement"), which is attached hereto as Exhibit A.

## Basis For Relief Requested

10.        Under sections 327(a) and 328(a) of the Bankruptcy Code, a debtor in possession is authorized to employ professional persons that do not hold or represent an interest adverse to the estate and that are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, to represent or assist the debtor in carrying out its duties under the Bankruptcy Code. Section 1107(b) of the Bankruptcy Code modifies sections 101(14) and 327(a) in cases under chapter 11 of the Bankruptcy Code, providing that a person is not disqualified for employment under section 327(a) of the Bankruptcy Code by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case. Under section 328(a) of the Bankruptcy Code, a professional person

NY-1220934v4

retained under section 327(a) may be employed on any reasonable terms and conditions, including on retainer or on an hourly basis.

**Facts Relevant to the Relief Requested**

*The Debtor's Desire to Retain Blackstone*

11.     The Debtors have determined, in the exercise of their business judgment, that the size of their operations and the complexity of their attendant financial difficulties requires them to employ experienced advisors to render financial advisory and other related services in connection with these chapter 11 cases.

*Blackstone's Qualifications*

12.     The Debtors have selected Blackstone as their financial advisor because of Blackstone's diverse experience, knowledge and reputation in the restructuring field, understanding of the issues involved in chapter 11 cases, and because the Debtors believe that Blackstone possesses the requisite resources and is well qualified to provide the financial advisory services that will be required here.  Blackstone has served as financial advisor to debtors or other constituencies in many of the largest chapter 11 cases in the United States, including American Banknote Corp., AMF Bowling Worldwide, Inc., American Pad & Paper Company, Arch Wireless, Inc., Babcock & Wilcox Company, Best Products, Big V Supermarkets, The Caldor Corporation, Chiquita Brands International, ContiFinancial Corporation, Dow Corning Corporation, Enron Corporation, Evans Products, Global Crossing, Ltd., Globalstar L.P., Goss Holdings, Inc., Harnischfeger Industries, Hills Department Stores, Indesco International, Inc., The Leslie Fay Companies, Levitz Furniture, Inc., Loehmann's, Inc., LTV Corporation, Marvel Entertainment Group, Inc., MobileMedia Corp., Montgomery Ward Holding Co. (GECC), Motorola, Inc. (in the restructuring of Iridium LLC), Paragon Trade

Brands, Inc., The Penn Traffic Company, Phar-Mor, Inc., Premium Standard Farms, Inc., R.H. Macy & Co., The Singer Company N.V., and Vencor, Inc.

13.    The Debtors retained Blackstone effective on November 1, 2001 to serve as their financial advisor in connection with their restructuring efforts. Since then Blackstone has developed extensive knowledge of the Debtors' businesses, operations and financial condition.

***Services to Be Provided by Blackstone***

14.    The following Blackstone professionals will be responsible for providing professional services to the Debtors: Timothy Coleman, Senior Managing Director; Michael Hoffman, Senior Managing Director; Elias Dokas, Vice President; Shervin Korangy, Vice President; Mark Buschmann, Associate; Rakesh Chawla, Associate; Erica Tsai, Analyst; and Birche Fishback, Analyst.

15.    To date, Blackstone has provided the following services:

(a) Assisted the Debtors in developing and analyzing an operational and financial forecast;

(b) Performed business due diligence and assisted third-party financial advisors in conducting business due diligence on the Debtors' various lines of business;

(c) Attended meetings between the Debtors and various constituencies and their counsel and financial advisors to negotiate a Restructuring (as defined in the Letter Agreement);

(d) Worked with the Debtors to develop negotiating positions and strategy for financing and restructuring discussions with creditors;

(e) Performed various financial analyses on behalf of both the Debtors' and third-parties including, without limitation:

- financial analyses of the Debtors' projected operating performance;
- cash flow and liquidity analyses;

- various draft enterprise valuation and discounted cash flow analyses; and
- liquidation analyses;

(f) Reviewed financial analyses generated by both the Debtors' finance staff and other external and third-party advisors;

(g) Assisted the Debtors in negotiating the terms of a plan of reorganization (the "Plan") with their various creditors and other parties in interest; and

(h) Other general business and bankruptcy advice, as needed.

16. Pursuant to the Letter Agreement, upon approval of its retention, Blackstone will continue to provide the following professional services to the Debtors:

(a) Assist in the evaluation of the Company's businesses and prospects;

(b) Assist in revising and updating the Company's long-term business plan and related financial projections;

(c) Assist in raising additional capital to consummate a plan of reorganization for the purpose of implementing a Restructuring;

(d) Assist in the development of financial data and presentations to the Company's Board of Directors and holders of the Company's obligations;

(e) Meet, at the Company's request, with the Company's Board of Directors to discuss the Restructuring and its financial implications;

(f) Analyze various restructuring scenarios and the potential impact of these scenarios on the Company;

(g) Prepare all necessary valuation analyses in connection with confirmation of a plan of reorganization for the Debtors;

(h) Provide testimony in the chapter 11 case;

(i) Provide strategic advice with regard to restructuring of the Company's Obligations and consummation of a plan of reorganization; and

7

(j)  Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring, as requested and mutually agreed.

### *Disclosure Concerning Conflicts of Interest*

17.    Blackstone has informed the Debtors that, except as described in the verified statement of Timothy R. Coleman in support of this Application (the "Blackstone Disclosure" a copy of which is annexed to this Application as Exhibit "B"), Blackstone has no material connection with the Debtors, their creditors, equity security holders or any other parties in interest, or their respective attorneys, in the above-captioned chapter 11 cases.

18.    Based on the Blackstone Disclosure, the Debtors believe that Blackstone (i) does not hold or represent any interest adverse to the Debtors or their estates, and (ii) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code. Moreover, the Debtors believe that employment of Blackstone is necessary and in the best interests of the Debtors and their estates.

### *Disclosure of Compensation*

19.    The Letter Agreement provides for the following compensation to Blackstone; all amounts owed to Blackstone are obligations of WCL and not an obligation of the Debtors:

(a)  until the earlier of  consummation of the Plan and a termination of the Letter Agreement, a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 with the first two Monthly Fees payable upon the execution of the Letter Agreement by both parties for the months of May and June 2002, and additional installments of such Monthly Fee payable in advance on the first day of each month;

(b) a fee of $6,000,000 for raising additional material capital to consummate the Plan (the "Capital Fee") on terms approved by WCG's Board of Directors and consistent

with implementing the agreement, dated as of April 19, 2002, among WCG, WCL and certain of WCG's note holders and certain of WCL's lenders (a "<u>Qualifying Investment</u>"), including without limitation, capital from raises of debt, equity, equity-linked securities, commercial arrangements, and proceeds from mergers and sale transactions (as permitted by that certain Amended and Restated Credit Agreement among Bank of America, N.A., an administrative agent, WCL, WCG, and the lenders thereunder dated as of September 8, 1999, as amended from time to time (the "Amended <u>Credit Agreement</u>"), including the sale of the Company's emerging markets business unit) for the purpose of raising additional capital (excluding the sale of all or substantially all of the assets of the Company). The Capital Fee is due and payable upon the earliest of (i) execution of a binding commitment, subject to customary conditions and termination events, between the Company and such investor; (ii) receipt of consent from the Required Lenders (as defined in the Interim Credit Agreement) for payment of the Capital Fee; and (iii) consummation of the Plan;

(c) a fee of $12,000,000 due and payable upon consummation of the Plan (the "<u>Restructuring Fee</u>"). It is understood that, if no Capital Fee is payable, but a Plan of Reorganization is still consummated, Blackstone will be entitled to receive only 50% of the Restructuring Fee upon consummation of the Plan. The Capital Fee and Restructuring Fee will be paid in cash promptly when due; and

(d) reimbursement of all necessary and reasonable out-of-pocket expenses incurred in connection with this engagement, including, but not limited to, travel and lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel and other

necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

20.     Because WCL, which is not a chapter 11 debtor, is financially responsible for payment of Blackstone's compensation and expense reimbursement, the proposed Order excuses Blackstone from being required to file fee applications; Blackstone shall instead look to WCL for payment of its compensation and reimbursement of expenses.

21.     The fees described above are consistent with Blackstone's normal and customary billing practices for cases of this size and complexity, which require the level and scope of services outlined in the Letter Agreement.

22.     Blackstone has provided certain financial restructuring advisory services (the "Restructuring Advisory Services") to WCL and the Debtors since November 1, 2001 and has been paid for those services on a monthly basis in accordance with the Letter Agreement.  To date, Blackstone has received $7,200,000 for Restructuring Advisory Services rendered and $98,680 in expense reimbursements.  Prior to the Petition Date, Blackstone received a $50,000 advance to be maintained against unbilled out-of-pocket expenses incurred in connection with the Restructuring Advisory Services and will credit the advance as of the Petition Date against expenses incurred thereafter.

23.     Furthermore, prior to its current engagement, Blackstone was on retainer for financial advisory services ("Other Financial Advisory Services") from August 1999 to August 2001 and advised WCG on the sale of its business units, Williams Communications Solutions and Williams Communications Canada.  In the one year period preceding these chapter 11 cases, Blackstone received a total of $4,475,194.88 on account of these Other Financial Advisory Services and expenses incurred in connection therewith.  The Debtors do not owe Blackstone any sums for prepetition services.

10

## Waiver of Memorandum of Law

24.     Pursuant to Local Rule 9013-1(b), because there are no novel issues of law presented herein, the Debtors request the Court waive the requirement that the Debtors file a memorandum of law in support of this application.

## Notice

25.     Pursuant to the Court's order, dated April 24, 2002, establishing notice procedures in these chapter 11 cases, notice of this application has been given to (a) THE OFFICE OF THE UNITED STATES TRUSTEE for the Southern District of New York; (b) CLIFFORD CHANCE ROGERS & WELLS, counsel to the Agent for the Debtors' prepetition secured lenders; (c) KIRKLAND & ELLIS, proposed counsel to the Official Creditors' Committee; (d) WHITE & CASE LLP, counsel to TWC; (e) the indenture trustees for WCG's Senior Redeemable Notes; (f) those persons who have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002; and (g) government agencies to the extent required by the Bankruptcy Rules and Local Rules. The Debtors respectfully submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request entry of an order, in the form annexed hereto as Exhibit "C", granting the Debtors the relief requested herein, and such other and further relief as is just.

Dated: New York, New York
       June 17, 2002

/s/ Erica M. Ryland
Corinne Ball, Esq. (CB 8203)
Erica M. Ryland, Esq. (ER 2057)
JONES, DAY, REAVIS & POGUE
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for Debtors
  and Debtors in Possession

**EXHIBIT A**



The Blackstone Group

June 3, 2002

Mr. Scott Schubert
Chief Financial Officer
Williams Communications Group, Inc.
Williams Communications, LLC
One Technology Center
Mail Drop 15A
Tulsa, OK 74103

Dear Scott:

This letter confirms the understanding and agreement (the "Agreement") between The Blackstone Group L.P. ("Blackstone") and Williams Communications Group, Inc. ("Holdco"), Williams Communications, LLC ("Opco" and, collectively with Holdco and their respective affiliates, "WCG" or the "Company") regarding the retention of Blackstone on an exclusive basis by WCG effective as of November 1, 2001 (the "Effective Date") as its financial advisor for the purposes set forth herein. This letter amends and supercedes and replaces all previously-existing retention agreements between or among Blackstone, WCG and/or WCLLC, including (i) the letter agreement dated February 26, 2002 between Blackstone and WCG, (ii) the letter agreement dated October 29, 2001 between Blackstone and WCG, and (iii) the letter agreement dated August 10, 2000 between Blackstone and WCG.

Under this Agreement, Blackstone will provide financial advisory services to WCG in connection with a possible "Restructuring" (as defined below) of certain liabilities of the Company and will assist WCG in analyzing, structuring, negotiating, and effecting the Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term Restructuring shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of the Company and/or its affiliates and subsidiaries affecting existing or potential debt obligations or other claims including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, etc. (collectively, the "Obligations"). Obligations of the Company are understood to include all items listed in Exhibit 1.

The financial advisory services to be rendered by Blackstone include the following:

The Blackstone Group® L.P.
345 Park Avenue
New York, NY 10154
212 583 5000

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 2

(a)     Assist in the evaluation of the Company's businesses and prospects;

(b)     Assist in the development of the Company's long-term business plan and related financial projections;

(c)     Assist in raising additional capital to consummate a plan of reorganization confirmed under Chapter 11 for the purpose of implementing a Restructuring (the "Plan");

(d)     Assist in the development of financial data and presentations to the Company's Board of Directors and holders of the Obligations;

(e)     Meet, at the Company's request, with the Company's Board of Directors to discuss the Restructuring and its financial implications;

(f)     Analyze various restructuring scenarios and the potential impact of these scenarios on the Company;

(g)     Provide testimony in the Chapter 11 case;

(h)     Provide strategic advice with regard to restructuring or refinancing of the Obligations; and

(i)     Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Chapter 11 case or a Restructuring, as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete the Restructuring. Blackstone is retained under this Agreement solely to provide advice regarding the Restructuring, and is not "crisis management."

Blackstone shall be entitled to the following Fees for its financial advisory services:

(i)     until the earlier of consummation of the Plan and a termination of this Agreement, a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 with the first two Monthly Fees payable upon the execution of this Agreement by both parties for the months of May and June 2002 by both parties

NY-1211845v2

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 3

and additional installments of such Monthly Fee payable in advance on the first day of each month;

(ii)    a fee of $6,000,000 for raising additional material capital to consummate the Plan (the "Capital Fee") on terms approved by the Company's Board of Directors and consistent with implementing the agreement, dated as of April 19, 2002, among Holdco, Opco and certain of Holdco's note holders and certain of Opco's bank lenders (a "Qualifying Investment"), including without limitation, capital from raises of debt, equity, equity-linked securities, commercial arrangements, and proceeds from mergers and sale transactions (as permitted by Amended and Restated Credit Agreement, dated as of September 8, 1999, as amended from time to time) for the purpose of raising additional capital (excluding the sale of all or substantially all of the assets of the Company). The Capital Fee is due and payable upon the earliest of (i) execution of a binding commitment, subject to customary conditions and termination events, between the Company and such investor; (ii) receipt of consent from the Required Lenders (as defined in the Interim Credit Agreement) for payment of the Capital Fee; and (iii) consummation of the Plan;

(iii)   a fee of $12,000,000 due and payable upon consummation of the Plan (the "Restructuring Fee"). It is understood that, if no Capital Fee is payable, but a Plan of Reorganization is still consummated, Blackstone will be entitled to receive only 50% of the Restructuring Fee upon consummation of the Plan. The Capital Fee and Restructuring Fee will be paid in cash promptly when due; and

(iv)    reimbursement of all necessary and reasonable out-of-pocket expenses incurred in connection with this engagement, including, but not limited to, travel and lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses. The Company has paid to Blackstone and agrees to maintain a $50,000 advance against such expenses. Any unused portion of this advance will be returned to the Company at the end of the engagement.

Pursuant to our previous letter agreements dated as of November 1, 2001 and February 26, 2002, it is acknowledged that Blackstone has received, prior to the execution of this letter, $7,200,000 for financial advisory services rendered between the Effective Date and April 30, 2002. All fees and expenses payable to Blackstone pursuant to this letter shall be payable solely by Williams Communications, LLC.

NY-1211845v2

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 4

Since Holdco has become a debtor under Chapter 11 of the Bankruptcy Code, the Company shall apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement and (B) Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is reasonably acceptable to Blackstone in all respects. With respect to Blackstone's retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that Blackstone's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of Blackstone's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of Blackstone's services hereunder could not be measured merely by reference to the number of hours to be expended by Blackstone's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Blackstone and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Blackstone and that the actual time and commitment required of Blackstone and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which Blackstone may be required to address in the performance of its services hereunder, Blackstone's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Blackstone's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

Except as set forth above, the advisory services and compensation arrangement set forth in this Agreement shall not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including arranging of other debt or equity capital, providing mergers and acquisitions advice other than as contemplated by the Capital Fee definition, issuing fairness opinions, or any other specific services not set forth in this Agreement; provided, however that Blackstone will not be entitled to any additional

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 5

compensation for investment banking services or transactions, arrangements of debt or capital or mergers and acquisitions or other advice rendered in connection with a Restructuring or the Company's emerging markets business unit unless explicitly outlined in this Agreement. The terms and conditions of any additional investment banking services or transactions (except as set forth above), including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the Company with prior notice to the Committee and Administrative Agent.

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

The Company will furnish or cause to be furnished to Blackstone such information as Blackstone believes appropriate to its assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors) without the prior consent of Blackstone. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company and shall not be relied upon by any other person.

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 6

The Company acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. Blackstone shall act as an independent contractor, and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. Because Blackstone will be acting on the Company's behalf in this capacity, it is customary for us to receive indemnification. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that, as a result of or in connection with Blackstone's engagement for the Company, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the separate indemnification agreement attached hereto.

Blackstone's engagement hereunder may be terminated upon 30 days' written notice without cause by either the Company or Blackstone; termination for cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor, and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A, (c) Blackstone shall be entitled to the (i) the Capital Fee upon a Qualifying Investment by any party with which Blackstone held substantive discussions and (ii) the Restructuring Fee upon consummation of the Plan at any time prior to the expiration of twelve months following the termination of this Agreement (other than for cause), and (d) Blackstone shall keep confidential all material non-public information provided to it or at the request of the Company for a period of twenty four months following termination. For purposes of this paragraph, "cause" means the gross negligence or bad faith of Blackstone in performing its services pursuant to this Agreement.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of the private equity businesses of Blackstone and its affiliates in their businesses distinct from the restructuring advisory business of Blackstone provided that the Information is not shared with representatives of Blackstone and its affiliates who are not involved in the restructuring advisory business of Blackstone and that appropriate "Chinese wall" measures are taken to insure confidentiality.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 7

determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company irrevocably submits to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

NY-1211845v2

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 8

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

THE BLACKSTONE GROUP L.P.

By:

Timothy R. Coleman
Senior Managing Director

Accepted and Agreed to as
of the date first written above:

WILLIAMS COMMUNICATIONS GROUP, INC.
WILLIAMS COMMUNICATIONS, LLC

By:

Scott Schubert
Chief Financial Officer

NY-1211845v2

Scott Schubert
Chief Financial Officer
June 3, 2002
Page 9

EXHIBIT 1

The term "Obligations" shall include any of but not be limited to the following:

(1) $525.0 million Term Loan as defined in Amended and Restated Credit Agreement of September 8, 1999

(2) $450.0 million Incremental Tranche A Term Loan as defined in Amended and Restated Credit Agreement of September 8, 1999

(3) $443.5 million 10.7% Senior Notes due 2007

(4) $445.0 million 11.7% Senior Notes due 2008

(5) $1.25 billion 10.875% Senior Notes due 2009

(6) $315.5 million 11.875% Senior Notes due 2010

(7) $1.4 billion 8.25% Structured Note

(8) $750 million Asset Defeasance Program ("ADP")

NY-1211845v2

ATTACHMENT A

June 3, 2002


The Blackstone Group L.P.
345 Park Avenue
New York, NY  10154

## INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of June 3, 2002 (the "Engagement Letter"). In consideration of your agreement to act on our behalf in connection with such matters, we agree jointly and severally to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigation, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for the amount, if any, of any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have resulted from the bad faith, negligence or willful misconduct of any Indemnified Party (and such expenses shall be reimbursed to us promptly upon such determination). We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have resulted from the bad faith, negligence or willful misconduct of any Indemnified Party.

NY-1202480v4

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

Neither party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel with the other parties to this agreement would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us

to represent or defend it in any such action or proceeding and we will pay the reasonable fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

WILLIAMS COMMUNICATIONS GROUP, INC.
WILLIAMS COMMUNICATIONS, LLC

By

Scott Schubert
Chief Financial Officer

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By:

Timothy R. Coleman
Senior Managing Director

NY-1211845v2

# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
```
*In re*                                     :
                                            :
**WILLIAMS COMMUNICATIONS GROUP,**   :        **Chapter 11 Case No.**
**INC. and CG AUSTRIA, INC.,**       :        **02-11957 (SMB)**
                                     :        **(Jointly Administered)**
                                     :
                        **Debtors.**  :
                                     :
```
------------------------------------------------------------x
```

**VERIFIED STATEMENT OF TIMOTHY R. COLEMAN IN SUPPORT OF THE**
**APPLICATION OF THE DEBTORS PURSUANT TO SECTIONS 327(a)**
**AND 328(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 2014(a) FOR AN ORDER AUTHORIZING THEM TO**
<u>**RETAIN THE BLACKSTONE GROUP L.P. AS FINANCIAL ADVISOR**</u>

STATE OF NEW YORK      )
                       )      ss.
COUNTY OF NEW YORK     )

TIMOTHY R. COLEMAN, deposes and says:

1.      I am a Senior Managing Director of The Blackstone Group L.P. ("<u>Blackstone</u>"), a

private investment banking firm that maintains offices at 345 Park Avenue, New York, New

York 10154, and I make this verified statement on behalf of Blackstone (the "<u>Statement</u>").  I

submit this Statement in support of the application (the "<u>Application</u>") of Williams

Communications Group, Inc. ("<u>WCG</u>") and CG Austria, Inc., as debtors in possession

(collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>")

for an order authorizing the employment and retention of Blackstone as financial advisor to the

Debtors.  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## Blackstone's Qualifications

2.        Blackstone is recognized for its expertise in providing financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in chapter 11 proceedings and serving as investment bankers in numerous cases.

3.        I have previously worked on many chapter 11 restructurings, advising debtors or creditors in various cases and have extensive experience working on companies in distressed situations.  Selected current and previous advisory assignments in which I have participated include:  Alliance Entertainment Corp., Bidermann Industries USA, CellNet Data Systems, Inc., Criimi Mae, Inc., Harnischfeger Industries, Inc., R.H. Macy & Co., Inc., Safelite Glass Corp., and Vencor Inc.

4.        Since November 1, 2001, Blackstone has rendered financial advisory services to the Debtors in connection with their restructuring efforts.  Blackstone has become familiar with the Debtors' operations and is well qualified to represent the Debtors as financial advisors in connection with such matters in a cost-effective and efficient manner.

## Disinterestedness of Professionals

5.        Based on the results of the conflict search conducted to date by Blackstone's compliance department and described more fully below, and based on my understanding of the Bankruptcy Code and Bankruptcy Rules and the practices being followed in other large chapter 11 cases, to the best of my knowledge, neither I, Blackstone, nor any member or employee thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, other parties-in-interest (as reasonably known to us), their respective attorneys, or the U.S. Trustee or any person employed in the Office of the U.S. Trustee, except as disclosed or otherwise described herein.

NY-1220934v4

6.      To the best of my knowledge, Blackstone is a "disinterested person" as that term is defined in section 101(14) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), as modified by section 1107(b) of the Bankruptcy Code, in that, its members and employees:

(a)  are not creditors, equity security holders or insiders of the Debtors;

(b)  are not and were not investment bankers for any outstanding security of the Debtors;

(c)  have not been, within three years before the date of the filing of the Debtors' chapter 11 petition, (i) investment bankers for a security of the Debtors, or (ii) an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the Debtors; and

(d)  were not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

7.      Prior to the Petition Date, Blackstone performed certain professional services for the Debtors.  Prior to its current engagement to provide restructuring advisory services (the "Restructuring Advisory Services") that commenced on November 1, 2001, Blackstone was on retainer for certain other financial advisory services (the "Other Financial Advisory Services") from August 1999 to August 2001, and advised WCG on the sale of its business units, Williams Communications Solutions and Williams Communications Canada.  In the one year period preceding these Chapter 11 Cases, Blackstone received a total of $4,175,882.94 on account of the Other Financial Advisory Services rendered and expenses incurred in connection therewith. The Debtors do not owe Blackstone any sums for prepetition services.

NY-1220934v4

8.	As part of its diverse practice, Blackstone appears in numerous cases, proceedings and transactions involving many different attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in the Chapter 11 Cases.  Further, Blackstone has in the past, and may in the future, be represented by several attorneys and law firms in the legal community, some of whom may be involved in these proceedings.  In addition, Blackstone has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein in matters upon which Blackstone is to be employed.  In connection with the preparation of this Statement, Blackstone has consulted with a member of the firm of Simpson Thacher & Bartlett ("ST&B"), who serves as counsel to an individual Lender under that certain Amended Credit Agreement dated as of September 8, 1999 (the "Amended Credit Agreement") among Bank of America, N.A. as Administrative Agent, WCL, WCG, and the lenders thereunder (the "Lenders").  However, that member of ST&B is not involved in ST&B's representation of the individual Lenders.  ST&B is Blackstone's principal outside counsel.

9.	Blackstone may have in the past represented, may currently represent, and likely in the future will represent, parties-in-interest of the Debtors in connection with matters unrelated to the Debtors and the Chapter 11 Cases (except as described below).  A list of the entities Blackstone's compliance department reviewed for conflicts is attached hereto as Schedule 1.  In connection therewith, the following specific disclosures are made:

(a)	Blackstone has a large and diverse financial advisory and principal investment practice.  Accordingly, Blackstone and certain of its members and employees may have in the past represented, may currently represent, and likely in the future will represent, in matters wholly unrelated to the Debtors' cases, entities that are parties in interest or otherwise connected to the Debtors.  The Debtors have supplied Blackstone with a list of

4

entities to be reviewed for conflicts, which has been reviewed by Blackstone's compliance personnel. Those personnel have determined that thirty-two financial institutions or telecommunications-related companies identified on such list appear on Blackstone's restricted list. Their names have not been revealed to me. Companies are put on Blackstone's restricted list if Blackstone has, or expects shortly to acquire, confidential information relating to such company, which it may receive for a variety of reasons. Blackstone may be precluded by duties of confidentiality from disclosing such relationships publicly; moreover, internal confidentiality procedures may preclude the disclosure of those names to professionals not involved with those companies. Blackstone is presently investigating in greater detail the confidentiality restrictions to which it is subject concerning those companies. Blackstone will provide as much disclosure as is permissible and will discuss with the U.S. Trustee any limitation on disclosure. However, as of the date of this Statement, to the best of my knowledge, Blackstone has not represented, does not represent, and will not represent any entities interest in the Chapter 11 Cases nor does it believe that any relationship it may have with any other entities will interfere with or impair Blackstone's representation of the Debtors in the Chapter 11 Cases.

(b) Affiliates of Blackstone serve as general partners for and manage a number of investment vehicles (collectively, the "Blackstone Funds"). The investors in the Blackstone Funds are principally unrelated third parties but also include affiliates of Blackstone and various of its officers and employees (collectively, the "Employees"), including Employees working on the Debtors' Chapter 11 Cases. In addition, certain of the Employees, including Employees working on the Debtors' Chapter 11 Cases, are limited partners in the Blackstone Funds. In their capacity as limited partners, these Employees have personal investments in the Blackstone Funds, but no control over investment decisions or over business decisions made at the Blackstone Funds. Among other things, the Blackstone Funds are (a) active direct investors in a number of portfolio companies (including, in the case of one such fund, companies in the telecommunications section), (b) active investors in various real estate investments and (c) passive investors in other funds (collectively, the "Investment Funds") managed by a number of non-traditional money managers, all of which are similar to investments in mutual funds. As would be the case with respect to a mutual fund investment, neither Blackstone, its affiliates, the Blackstone Funds nor the Employees have any control over the investments made by the Investment Funds in which the Blackstone Funds are invested, including investment purchases, investment divestitures and the timing of such activities. Blackstone maintains a strict separation between its Employees assigned to the Debtors' Chapter 11 Cases and the Employees assigned to the Blackstone Funds. To avoid any appearance of impropriety, where the Blackstone Funds may receive information about such Investment Funds' investing in companies in which Blackstone is acting as an advisor, Blackstone maintains internal procedures designed to preclude the dissemination of such information to the Employees who are providing such advisory services. Likewise, in accordance with U.S. securities law, no confidential information concerning the Debtors is permitted to be communicated to the Employees working for the Blackstone Funds. It is possible that companies owned, in whole or in part, by the Blackstone Funds or which may have had discussions regarding a possible investment or transaction in connection with the Blackstone Funds may have a relationship with the

5

Debtors or otherwise appear on the list of entities attached as exhibits to the Statement. These relationships are unrelated to the financial advisory services Blackstone intends to provide in the Debtors' Chapter 11 Cases. Blackstone maintains that these relationships are subject to the internal confidentiality procedures outlined immediately above and thus have no meaningful bearing on Blackstone's ability to advise the Debtors.

(c) Affiliates of Credit Suisse First Boston ("CSFB"), who is a Lender under the Amended Credit Agreement through various affiliates, have assisted Blackstone in the past in raising capital for the Blackstone Funds. The group at CSFB responsible for the Blackstone assignment is separate from the party-in-interest. In addition, The Chase Manhattan Bank ("Chase") has arranged a credit facility to Blackstone Group Holdings, L.P., the parent of Blackstone. Chase and CSFB are lenders under that facility. Chase also is a Lender under the Amended Credit Agreement. It is possible that other parties in interest in these cases could become lenders under that facility as well. None of the persons involved in this assignment are involved in the negotiation or administration of that facility. Such relationships will not interfere with or impair Blackstone's representation of the Debtors in these Chapter 11 Cases.

(d) Blackstone had been retained to advise Winstar Communications, Inc. and its affiliates that were debtors in Chapter 11 Cases. Winstar and its affiliates were customers of the Debtors. Blackstone is no longer engaged by Winstar or IDT, the firm that acquired Winstar in bankruptcy. Blackstone does not believe that such former relationship will impair or affect Blackstone's representation of the Debtors in their Chapter 11 Cases.

(e) Blackstone has been retained to advise Global Crossing Ltd. and its affiliates that are debtors in Chapter 11 Cases commenced in January 2002 in the Southern District of New York. Global Crossing is both a customer and competitor to the Debtors. Blackstone maintains internal procedures designed to preclude the dissemination of confidential information about the Debtors to the Employees who are providing advisory services to Global Crossing, and *vice versa*. No Employee working on the Debtors' Chapter 11 Cases currently works on the Global Crossing engagement or receives confidential information concerning Global Crossing. Likewise, no Employee working on the Global Crossing engagement currently works on the Debtors' Chapter 11 Cases and no confidential information concerning the Debtors is permitted to be communicated to the Employees working for Global Crossing.

(f) Blackstone has been retained to advise Flag Telecom Holdings Ltd. and its affiliates (collectively, "Flag") that are debtors in Chapter 11 Cases commenced on April 12, 2002 in the U.S. Bankruptcy Court for the Southern District of New York. Flag and the Debtors are competitors in a de minimus portion of their business, namely the Atlantic undersea cable routes. The Company's Atlantic undersea cable business represents less than 1% of the Company's total revenues, historically and projected. Both I and Michael Hoffman represent Flag in their Chapter 11 Cases. However, given the limited competition between the Company and Flag, Blackstone does not believe that such relationships will impair or affect Blackstone's representation of the Debtors in their Chapter 11 Cases. In addition, Blackstone will take reasonable care in ensuring that

confidential information of the Debtors or the Company is not shared with Flag, and *vice versa*.

10.     The entities disclosed herein have been located by Blackstone using its reasonable efforts.  It is Blackstone's intent to update and expand its ongoing conflict search for additional parties in interest in an expeditious manner and update this information as necessary.  Blackstone is confident that its connections with such other persons in unrelated matters will not affect its representation of the Debtors in these proceedings.

11.     To the best of my knowledge, Blackstone has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, the Chapter 11 Cases.  If this Court approves the proposed employment of Blackstone by the Debtors, Blackstone will not accept any engagement or perform any services for any entity or person other than the Debtors in this situation.  Blackstone will, however, continue to provide professional services to entities or persons that may be parties in interest in the Chapter 11 Cases; provided, however, that such services do not relate to, or have any direct connection with, the Chapter 11 Cases.

12.     Blackstone will periodically review its files during the pendency of the Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, Blackstone will use reasonable efforts to identify such further developments and will promptly file a Supplemental Statement.

## **Professional Services Compensation**

13.     The parties have entered into an agreement that would govern the relationship between Blackstone and the Debtors, a copy of which is attached as Exhibit "A" to the Application (the "Letter Agreement").  Blackstone will provide such financial advisory services (the "Restructuring Advisory Services") as Blackstone and the Debtors shall deem appropriate

and feasible in order to advise the Debtors in the course of the Chapter 11 Cases, including, but not limited to, the follows:

(a)  Assist in the evaluation of the Company's businesses and prospects;

(b)  Assist in revising and updating the Company's long-term business plan and related financial projections;

(c)  Assist in raising additional capital to consummate a plan of reorganization for the purpose of implementing a Restructuring;

(d)  Assist in the development of financial data and presentations to the Company's Board of Directors and holders of the Company's Obligations;

(e)  Meet, at the Company's request, with the Company's Board of Directors to discuss the Restructuring and its financial implications;

(f)  Analyze various restructuring scenarios and the potential impact of these scenarios on the Company;

(g)  Prepare all necessary valuation analyses in connection with confirmation of a plan of reorganization for the Debtors;

(h)  Provide testimony in the Chapter 11 Cases;

(i)  Provide strategic advice with regard to restructuring of the Company's Obligations and consummation of a plan of reorganization; and

(j)  Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring, as requested and mutually agreed.

14.  The Financial Advisory Services set forth in the Letter Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including arranging of other debt or equity capital,

providing mergers and acquisitions advice other than as contemplated by the Capital Fee definition, issuing fairness opinions, or any other specific services not set forth in the Letter Agreement; provided, however that Blackstone will not be entitled to any additional compensation for investment banking services or transactions, arrangements of debt or capital or mergers and acquisitions or other advice rendered in connection with a Restructuring or the Company's emerging markets business unit unless explicitly outlined in the Letter Agreement. The terms and conditions of any additional investment banking services or transactions (except as set forth above), including compensation arrangements, will be set forth in a separate written agreement between Blackstone and the Company on prior notice to the Committee and the Administrative Agent under the Amended Credit Agreement.

15. The Financial Advisory Services that Blackstone will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully. The Financial Advisory Services will not duplicate the services that, subject to this Court entering or having entered appropriate orders, other financial advisors, if any, would provide to the Debtors in these cases. Blackstone will carry out unique functions and will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the unnecessary duplication of services.

16. Blackstone has agreed to represent WCG, Williams Communications, LLC ("WCL") and their affiliates for compensation at the amounts agreed upon between the parties pursuant to the Letter Agreement. As more fully described in the Letter Agreement, in consideration of the Restructuring Advisory Services provided by Blackstone, WCL has agreed to pay Blackstone:

> (a) until the earlier of consummation of the Plan and a termination of the Letter Agreement, a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 with

the first two Monthly Fees payable upon the execution of the Letter Agreement by both parties for the months of May and June 2002, and additional installments of such Monthly Fee payable in advance on the first day of each month;

(b) a fee of $6,000,000 for raising additional material capital to consummate the Plan (the "Capital Fee") on terms approved by WCG's Board of Directors and consistent with implementing the agreement, dated as of April 19, 2002, among WCG, WCL and certain of WCG's note holders and certain of WCL's Lenders (a "Qualifying Investment"), including without limitation, capital from raises of debt, equity, equity-linked securities, commercial arrangements, and proceeds from mergers and sale transactions (as permitted by the Amended Credit Agreement, including the sale of the Company's emerging markets business unit) for the purpose of raising additional capital (excluding the sale of all or substantially all of the assets of the Company). The Capital Fee is due and payable upon the earliest of (i) execution of a binding commitment or other similar documentation, subject to customary conditions and termination events, between the Company and such investor; (ii) receipt of consent from the required lenders; and (iii) consummation of the Plan;

(c) a fee of $12,000,000 due and payable upon consummation of the Plan (the "Restructuring Fee"). It is understood that, if no Capital Fee is payable, but a plan of reorganization is still consummated, Blackstone will be entitled to receive only 50% of the Restructuring Fee upon consummation of the Plan. The Capital Fee and Restructuring Fee will be paid in cash promptly when due; and

(d) reimbursement of all necessary and reasonable out-of-pocket expenses incurred in connection with this engagement, including, but not limited to, travel and lodging, direct identifiable data processing and communication charges, courier services,

10

working meals, reasonable fees and expenses of Blackstone's counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

17.     Based on its experience and independent analysis, Blackstone believes that the fee structure is fair and reasonable.  Blackstone believes that the fee structure appropriately reflects the nature and scope of the services to be provided by Blackstone, Blackstone's substantial experience with respect to financial advisory services, and the fee structures typically utilized by Blackstone and other leading financial advisors that do not bill their clients on an hourly basis.

18.     To date, Blackstone has provided the following services to the Debtor:

(a)  Assisted the Debtors in developing and analyzing an operational and financial forecast;

(b)  Performed business due diligence and assisted third-party financial advisors in conducting business due diligence on the Debtors' various lines of business;

(c)  Attended meetings between the Debtors and various constituencies and their counsel and financial advisors to negotiate a Restructuring;

(d)  Worked with the Debtors to develop negotiating positions and strategy for financing and restructuring discussions with creditors;

(e)  Performed various financial analyses on behalf of both the Debtors' and third-parties including, without limitation:

- financial analyses of the Debtors' projected operating performance;
- cash flow and liquidity analyses;
- various draft enterprise valuation and discounted cash flow analyses; and
- liquidation analyses;

(f)  Reviewed financial analyses generated by both the Debtors' finance staff and other external and third-party advisors;

11

(g)  Assisted the Debtors in negotiating the terms of a plan of reorganization (the "Plan") with their various creditors and other parties in interest; and

(h)  Other general business and bankruptcy advice, as needed.

19.     To date, Blackstone has received $98,680 in expense reimbursements, $7,200,000 for Restructuring Advisory Services rendered pursuant to the Letter Agreement and $4,475,194.88 for Other Financial Advisory Services and expenses incurred from August 1999 to August 2001, for a total of $11,823,825.56 in the one year period preceding the Petition Date.

20.     Prior to the Petition Date, Blackstone received a $50,000 advance to be maintained against unbilled out-of-pocket expenses incurred and will credit the advance as of the Petition Date against expenses incurred thereafter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 17, 2002.

/s/ Timothy R. Coleman_____
Timothy R. Coleman

NY-1220934v4

## SCHEDULE 1

Alcatel NA
AT&T Corp.
Bank One Corp.
Birch Telecom Inc.
Cable & Wireless plc
Cablecom GmbH
Canadian Pacific Railway Inc.
JP Morgan Chase & Co.
Citizens Communications
Communications Supply Corporation
Credit Suisse First Boston
Flag Telecom Holdings Ltd.
Frontier Communications (Global Crossing)
Global Crossing Ltd.
Hewlett-Packard Company
ICG Communications, Inc.
ITC Deltacom Communications Inc.
KPN NV
Loral Space & Communications Ltd.
McLeod USA
Motorola, Inc.
Newskies Satellites NV
Nextira LLC
PanAmSat International Systems Inc.
Platinum Equity Holdings
Primus Telecommunications Group Inc.
The Prudential
Rhythms Netconnections Inc.
SBC Communications Inc.
Sony Corporation
Teleglobe Inc.
Time Warner Telecom Inc.
Verizon Communications Inc.
Winstar Communications, Inc.

**EXHIBIT C**

Exhibit C-2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
*In re*                                    :
                                           :
**WILLIAMS COMMUNICATIONS GROUP,**  :          **Chapter 11 Case No.**
**INC. and CG AUSTRIA, INC.,**      :          **02-11957 (SMB)**
                                           :          **(Jointly Administered)**
                                           :
                          **Debtors.**     :
                                           :
-------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE AND RULE 2014 OF THE BANKRUPTCY RULES AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY THE BLACKSTONE GROUP L.P. AS FINANCIAL ADVISOR

Upon the motion (the "Application")[1] of the debtors in the above-captioned cases (collectively, the "Debtors") for entry of an order pursuant to sections 327 and 328 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to retain and employ The Blackstone Group L.P. ("Blackstone") as financial advisor in these chapter 11 cases; and upon sworn statements submitted to the Court in support of the Application;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The Court has jurisdiction over the Application pursuant to sections 157 and 1334 of title 28 of the United Sates Code (the "Judicial Code");

B.      This is a core proceeding pursuant to 157(b)(2) of the Judicial Code;

C.      Venue for proceedings on the Application is proper in this district pursuant to section 1409 of the Judicial Code.

---

[1]     Unless otherwise defined herein, all capitalized terms used herein shall have the meanings set forth in the Application.

D.      Notice of the Application was sufficient;

E.      Cause exists for the granting of the relief requested in the Application;

F.      It appears that Blackstone does not hold or represent any interest adverse to the Debtors' estates and is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code;

G.      It appears that the employment of Blackstone is necessary and would be in the best interests of the Debtors, their creditors and estates; and

H.      It appears that The terms of compensation being sought by Blackstone, as described in the Letter Agreement are reasonable; and

IT IS HEREBY ORDERED THAT:

1.      The Debtors are authorized, effective as of the commencement of these cases, to employ and retain Blackstone as their financial advisors, on the terms set forth in the Letter Agreement.

2.      All requests of Blackstone for payment of indemnity pursuant to the Letter Agreement shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Letter Agreement and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, provided however, that in no event shall Blackstone be indemnified in the case of its own bad faith, self dealing, breach of fiduciary duty, negligence, or willful misconduct.

3.      In no event shall Blackstone be indemnified if the Debtors or a representative of the estates asserts a claim for, and the Court determines by final order that such claim arose out of, Blackstone's own bad faith, self dealing breach of fiduciary duty, negligence or willful misconduct.

NY-1220934v4

4.      Because WCL, which is not a chapter 11 debtor, is financially responsible for payment of Blackstone's compensation and expense reimbursement, Blackstone shall not be required to file fee applications but shall instead look to WCL for payment of its compensation and reimbursement of expenses.

5.      To the extent this Order is inconsistent with the Letter Agreement, this Order shall govern.

Dated:  July __, 2002

_____
CHIEF UNITED STATES BANKRUPTCY JUDGE

NY-1220934v4